(No. 88-CC-2692–

ELMAN H. CLECKLEY, Claimant, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed May 10, 1994.*
*Order on petition for rehearing filed September 19, 1994.*

ROBERT M. HODGE, for Claimant.

ROLAND W. BURRIS, Attorney General (STEVEN SCHMALL, Assistant Attorney General, of counsel), for Respondent.

## OPINION

FREDERICK, J.

Claimant filed his complaint sounding in medical negligence in the Illinois Court of Claims on February 25, 1988. The Claimant alleged that in 1987, while he was serving a sentence in the Illinois Department of Corrections, the State failed to diagnose his condition of osteomyelitis which led to the loss of three of Claimant's toes from his left foot and pain and suffering. The cause was tried before Commissioner Rochford.

The Claimant, Elman Cleckley, testified at the trial of this cause. Mr. Cleckley was 70 years old. He testified he has been an insulin-dependent diabetic for 30 years and takes 50 units of insulin daily. At the time of his incarceration, Claimant also suffered from high blood pressure and cataracts.

On June 7, 1986, Claimant entered Cook County Jail.

On July 11, 1986, while in Cook County Jail, Claimant developed gangrene in his left big toe. The toe was amputated in August of 1986 and the foot healed completely.

On November 27, 1986, Claimant was transferred to Joliet Reception and Classification Center where a physical examination noted Claimant had a history of diabetes, tuberculosis, eye trouble, high blood pressure, arthritis in his hands, and the amputation of the big toe from his left foot.

Claimant was transferred to Jacksonville Correctional Center on December 11, 1986. On January 10, 1987, the Claimant presented himself to the prison infirmary after noticing a blister on his left foot that started to drain pus. Doctor John Peterson, a family practitioner, performed a physical examination and noted that the Claimant's second toe was swollen and black. The doctor did not note any redness or swelling in the rest of the foot. Dr. Peterson diagnosed cellulitis in the second toe and he ordered an aerobic culture and antibiotics. He did not order an anaerobic culture.

On January 17, 1987, Claimant reported pus coming from the toe. On January 18, 1987, the drainage was noted and on January 19, 1987, the area was treated with Betadine ointment.

On January 21, 1987, Claimant was admitted to the prison infirmary with a temperature of 100 degrees and he was placed on intravenous antibiotics. Dr. Peterson examined and reviewed Claimant's history and diagnosed gangrene cellulitis.

On January 22, 1987, Dr. Drennan performed a debridement of the affected area. Claimant was further treated with oral antibiotics, Betadine soaks, and hydrotherapy foot massage. Claimant was released from the prison infirmary on February 9, 1987.

On April 18, 1987, a second toe became infected. Claimant was admitted to Passavant Area Hospital on April 24, 1987, where his second toe was amputated by Dr. Drennan. Claimant was treated with intravenous antibiotics. Bone and tissue were surgically removed. Claimant was released to his unit on May 12, 1987.

On May 12, 1987, an examination revealed that the surgery site had healed well. On July 16, 1987, Claimant presented with his third and fourth toes swollen with blisters and signs of infection. He was given antibiotics. A diagnosis of cellulitis was made and the Claimant was placed on IV medication and Betadine foot soaks. On July 27, 1987, Claimant's third and fourth toes were amputated at Passavant Area Hospital. The pathology report indicated cellulitis. Claimant returned to the prison infirmary and remained there until his amputation site healed. On August 22, 1987, Claimant's foot was sore, swollen and draining. He was put on antibiotics and instructed as to applying compression dressing on his foot.

On September 3, 1987, Claimant had some draining. He was given a prescription for antibiotics and instructed to see a physician after his release from prison. Claimant was released from prison on September 4, 1987. On September 4, 1987, Claimant had swelling from his foot to his lower leg.

Claimant first saw Dr. John Bartel on September 22, 1987. He next saw Dr. Bartel on October 27, 1987. An x-ray at that time indicated Claimant had osteomyelitis of the foot. Claimant was admitted to Illinois Masonic Medical Center on November 11, 1987. During this 19-day hospitalization, some infected bone and tissue were removed.

Claimant was examined again by Dr. Bartel on December 17, 1987. The doctor noted that the patient's

condition was improved but noted a blister on the second metatarsal of the left foot. On January 4, 1988, examination revealed an ulceration on Claimant's left foot. Dr. Bartel debrided the lesion, applied antiseptic, and provided a pad for Claimant's shoes. On January 30, 1988, the ulceration had worsened.

Dr. Bartel recommended further surgery to remove infected bone, but Claimant refused. On February 25, 1988, Claimant was admitted to Little Company of Mary Hospital and the surgery was scheduled, however, Claimant left the hospital prior to surgery.

On March 17, 1988, Claimant was admitted to Little Company of Mary Hospital under the care of Dr. Kalimuthu. On March 24, 1988, a debridement and resection of the second metatarsal bone of the left foot was performed and infected bone fragments were removed. Additional x-rays evidenced osteomyelitis of the second metatarsal. Claimant's condition improved and he was discharged on April 4, 1988. The discharge diagnosis was: (1) infected abscess of the left foot, (2) osteomyelitis of second metatarsal, (3) uncontrolled diabetes, and (4) peripheral vascular disease.

Claimant was hospitalized from November 29 to December 10, 1988, for further debridement of the infected left foot.

Claimant was again hospitalized from January 20 to February 3, 1989, at which time the affected area of the left foot was debrided and infected bone removed. Dr. Stachowski, a consulting physician, summarized Claimant's condition as follows:

"My feeling ° ° ° is that he has a chronic infection of his foot with underlying chronic osteomyelitis. I think that the prognosis of this foot is poor and that he will eventually need, perhaps, a below-the-knee amputation. I think that therapy at this time is local therapy and good hygiene."

Claimant took some time to heal. Arrangements were made for a visiting nurse agency to follow his blood sugar and to check on his dressings.

Claimant was then seen by Dr. John Bartel on February 28, 1989, and March 9, 1989. Dr. Bartel noted the new problems at the first and fourth metatarsal and recommended amputation of the front of the foot.

Claimant testified that he consulted Dr. Bartel who told him that more radical surgery was required to finally cure the osteomyelitis. Claimant declined the surgery. Claimant received dressings and Betadine, a disinfectant, from Fantus Clinic.

The Claimant submitted copies of medical bills for treatment rendered after he left the penitentiary. The submitted medical bills total $38,366.51.

Dr. John A. Bartel, a doctor of podiatric medicine, testified on behalf of the Claimant and he testified without objection. Dr. Bartel is the medical director of the School of Podiatric College at the Illinois Masonic Medical Center and is board certified by the American Board of Podiatric Surgery in foot surgery. Dr. Bartel testified that he treats 100 patients annually for serious diabetic infections.

Based on a review of Claimant's medical records, Dr. Bartel testified that Claimant had an infection in January 1987. Dr. Bartel stated the symptoms of cellulitis and osteomyelitis are redness, swelling, open wound, drainage and pain. He stated that osteomyelitis can only be distinguished from cellulitis by the severe pain and long duration of pain caused by osteomyelitis.

Dr. Bartel further testified that Claimant would not be able to report the pain because he was suffering from

diabetic neuropathy which results in sensory loss, muscle weakness, atrophy and decreased deep tendon reflexes.

In Dr. Bartel's opinion, the only way the treating physicians could have distinguished between osteomyelitis and cellulitis in this case would be through x-rays and anaerobic cultures.

Dr. Bartel testified that the standard of care for diabetic foot infections is set forth in *The Management of Diabetic Foot Problems*, Jocelyn Clinic of New England Deaconess Hospital (1984). The procedures indicated are culture, bed rest, antibiotic, appropriate drainage, proper dressings, and neuropathic x-rays.

Based on the authorities, his review of records and his treatment of the Claimant, Dr. Bartel testified without objection that Dr. Peterson's failure to take an x-ray constituted a deviation from the standard of care. The ability to establish osteomyelitis through an x-ray depends on how much bacteria has attacked the bone. Where the infection is well advanced, an x-ray could give a definitive reading. Dr. Bartel stated that standard treatment for diabetics, where vascular compromise is a problem, includes both aerobic and anaerobic cultures. Dr. Bartel concluded that the failure to take an anaerobic culture was a deviation from the standard of care.

Aerobic and anaerobic cultures are necessary to determine the proper level of antibiotics necessary to heal an infection. Dr. Bartel testified that with osteomyelitis, skin can cover a wound and give the appearance that it is clean or healed even though it is still infected. It will break down later and drain and then come back again. Dr. Bartel believed that this process occurred to Claimant.

After the culture was taken, Claimant was treated with Keflex for three days, then with Ampicillin for three

days, and then with Keflex. Dr. Bartel opined that this was inconsistent with any infectious disease process of which he was aware. Dr. Bartel testified Claimant should have been given an antibiotic for at least five days and up to ten days, or if osteomyelitis was diagnosed, an antibiotic should have been given for up to six weeks. He claims it was a deviation from the standard of care to change from one antibiotic to another and using it for a short period not knowing whether osteomyelitis was present. Relying on *The Management of Diabetic Foot* by Levin (1977), Dr. Bartel also testified that intravenous antibiotics should have been ordered instead of oral antibiotics because they provide greater concentration to the infected area.

With respect to the debridement performed on January 22, 1987, Dr. Bartel testified that it was unclear from the records whether the debridement procedure was sterile. Relying on the fact that a registered nurse signed the records, Dr. Bartel believes the debridement procedure was improper because it was not performed by a physician under sterile conditions. Dr. Bartel gave the opinion that this procedure constituted a deviation from the standard of care regardless of whether Claimant's diagnosis was for cellulitis or osteomyelitis.

Dr. Bartel further testified that a Betadine solution rather than an ointment is more effective in healing an infection. Dr. Bartel contends that it was inappropriate to use solution and ointment on Claimant. Dr. Bartel relied on *The Diabetic Foot*, which states, "topical paste and cream should be avoided because of their tendency to promote maceration." Maceration is a softening and dampening of an infected area and is harmful because it allows the infection to spread when moisture gets into the area and opens up the fascia planes. It also closes the area and prevents the infection from draining.

Dr. Bartel contends that the medical staff deviated from the standard of care by not opening the toe sooner than the debridement on January 22, 1987. Dr. Bartel testified that since there was a culture, there must have been drainage and the area should have been opened immediately in case of infection. Dr. Bartel contends that debridement or incision and drainage should have been done promptly regardless of whether cellulitis or osteomyelitis was diagnosed. Dr. Bartel contends that the debridement procedures and Betadine ointment soaks were not the equivalent of incision and drainage. The debridement would remove the outer layer of tissue and effectively open the area up to allow draining, but the Betadine ointment would close it and stop it from draining. However, Dr. Bartel candidly admitted that Claimant's condition improved after the debridement procedure.

Dr. Bartel also testified that it was improper to soak Claimant's foot at the same time Claimant's toe was being debrided. Soaking could result in an open wound being further macerated by the ointment, fluids and hydromassage causing the fascia planes to open further perpetuating the infection. Dr. Bartel admitted that sometimes after the infection is healed, soaking and whirlpool to debride is indicated. However, it is Dr. Bartel's opinion that this is not true in the case of an acute infection such as Claimant had.

Dr. Bartel contends that after bone was removed during debridement, a culture and/or pathology report should have been completed to determine the source of the problem. Dr. Bartel contends that the failure to do this was a deviation from the standard of care.

Claimant's ability to control his blood sugar level would increase his ability to heal. Dr. Bartel contends that while Claimant was incarcerated, his blood sugar level was not under tight enough control.

Dr. Bartel first treated Claimant following his release from Jacksonville Correctional Center in September 1987. Following x-rays taken in October, Dr. Bartel diagnosed Claimant as having osteomyelitis. Dr. Bartel performed surgery in November and removed the remaining infected parts of the phalanxes. The pathology report and the aerobic and anaerobic cultures confirmed the diagnosis of osteomyelitis. Dr. Bartel could not testify to a reasonable degree of medical certainty that Claimant's infection would have healed at Jacksonville had cultures, x-rays, incision and draining been performed because diabetics are a difficult problem. Without adequate care, the chance of healing was much less. In Dr. Bartel's opinion, it was certain Claimant would continue having problems and require further surgery. Dr. Bartel concluded that ultimately Claimant would need a below-the-knee amputation.

Dr. John Peterson, a medical doctor, was the medical director of Jacksonville Correctional Center during the period of Claimant's incarceration. He managed Claimant's treatment during his incarceration at Jacksonville. Dr. Peterson testified that he had been in private practice for 11 years and was on staff at Passavant Area Hospital. Dr. Peterson is certified in family practice and treats both diabetic and non-diabetic patients with foot problems in his private practice and at Jacksonville Correctional Center. Further, he was a board member for various diabetes-related organizations and a speaker for the State American Diabetes Association.

Dr. Peterson treated cases of osteomyelitis as a bacterial infection of the bone. He described the principle signs of osteomyelitis as redness, swelling, pain and drainage if the condition goes untreated. He testified that in his clinical opinion, Claimant did not have osteomyelitis in January of 1987. He found no evidence of osteomyelitis

in the physical examination. Dr. Peterson determined that Claimant did not have osteomyelitis because the end of his second toe was black and he had no redness or swelling in his foot. He found no reason to suspect that any other part of the foot was infected.

The medical staff was treating Claimant for a number of medical problems, including diabetes, hypertension, and glaucoma. As a medical doctor, Dr. Peterson is trained in general medicine. He stated that podiatrists, such as the Claimant's expert, Dr. Bartel, generally do not treat someone who has diabetes or hypertension and that they are limited to treating the foot and ankle.

Dr. Peterson testified that inmates at Jacksonville Correctional Center received the same, if not a better, standard of care than they would receive in the Jacksonville Community Hospital because the infirmary is so accessible.

Dr. Peterson believed that Dr. Bartel's criticisms and opinions are flawed because Dr. Bartel's report rests on the assumption that Claimant had osteomyelitis when Dr. Peterson first treated him in January of 1987. Dr. Peterson found no evidence to suggest that osteomyelitis was present. Dr. Peterson opined that Claimant could have developed the disease after his release from Jacksonville. Dr. Peterson suggested that the result of Dr. Bartel's report is based on that initial erroneous assumption.

At the initial examination, Dr. Peterson ordered an aerobic culture for Claimant's gangrenous toe and put him on Keflex, an antibiotic. Because the culture established that Claimant's infection was sensitive to Keflex, Dr. Peterson did not change the medication. Dr. Peterson did not order x-rays because the absence of redness or swelling in the foot established that the condition in Claimant's

second toe had not affected the rest of his foot. Dr. Peterson referred Claimant to Dr. Drennan, a general surgeon at Passavant Hospital, because his condition appeared to be a surgical problem that required surgical debridement. Dr. Drennan agreed with the diagnosis of gangrene to the toe. Dr. Drennan debrided Claimant's second toe and prescribed Betadine hydrotherapy. Dr. Peterson and Dr. Drennan concurred in diagnosis and treatment.

Dr. Peterson testified that Betadine ointment was appropriate for Claimant's condition because it prevents infections from spreading. Dr. Drennan had successfully used the therapy for years. Claimant's condition gradually improved following the debridement procedures. He was eventually released from the infirmary to the prisoner population at Jacksonville. He was taken off the antibiotics, but he continued daily Betadine hydrotherapy foot massage.

Claimant experienced no further medical problems until April of 1987 when the proximal part of his toe exhibited signs of possible infection. He was admitted to Passavant Hospital where Dr. Drennan amputated his second toe. Dr. Peterson concurred with the decision to amputate, concluding that if it had not been done, the infection could have been life-threatening and could have spread to the rest of Claimant's foot and possibly to the rest of Claimant's body. Following the surgery, the area surrounding Claimant's amputated toe began to heal.

Dr. Peterson testified that no more aerobic cultures were necessary because Claimant was responding well to the antibiotic and there was no reason to repeat a culture with improvement. An anaerobic culture is a deep culture which is used only if there is evidence of a deep infection, redness or swelling in the foot, according to Dr. Peterson. It was not ordered for Claimant because these clinical

signs were not present in Claimant's foot. For the same reasons, Dr. Peterson did not order any x-rays since there was no involvement of the foot. In regard to Dr. Bartel's assertion that the wrong antibiotic was used, Dr. Peterson stated that the culture and sensitivity report demonstrated that Keflex was the correct antibiotic. He was able to discontinue it because the toe had healed and there was no further evidence of infection. Dr. Peterson used oral rather than IV medication because it had been effective. However, Dr. Peterson noted he would use IV medication if he were treating osteomyelitis.

Following the debridement on January 21, 1987, the top of Claimant's second toe was open, but there was no sign of infection or drainage from February to April of 1987. Dr. Peterson disputed Dr. Bartel's assertions that the Betadine soaks were improper and that Claimant had a diabetic pressure ulcer. Dr. Peterson found that Claimant's condition was a vascular problem stemming from a lack of blood supply to his toe. Dr. Peterson testified that the better control one has of diabetes, the less vascular problems one will have. Dr. Peterson indicated that smoking also decreases blood flow and that Claimant would help improve his condition by not smoking.

Dr. Peterson disputed Dr. Bartel's claim that some of the debridements were non-sterile and performed by non-physicians. Dr. Peterson and Dr. Drennan performed all the surgical debridements using sterile gloves, sterile drapes and sterile treatments. Following the amputation, there was no evidence of a deep infection or drainage which would have suggested the need to perform another culture.

Dr. Peterson also took issue with Dr. Bartel's assertion that Claimant's blood sugar levels were not monitored frequently enough. Dr. Peterson testified that there

was frequent monitoring of Claimant's blood sugar levels during his incarceration and the State dietician consulted with Claimant to try to get him to comply with his diabetic diet. Claimant's blood sugar level was measured at 14 when he entered the Department of Corrections. His blood sugar level dropped from 14 to 9 after two months in the infirmary. Dr. Peterson testified that this is a significant improvement in light of the fact that a non-diabetic would have a level of six. Claimant's blood sugar level returned to 12 following his return to the general population.

Dr. Peterson countered Dr. Bartel's complaint that there was no incision and drainage by stating that there was no indication it was necessary because there was no evidence of redness or swelling of the foot.

In response to Dr. Bartel's testimony that the presence of an exuded bone in Claimant's foot was a sign of osteomyelitis, Dr. Peterson testified that Dr. Bartel erroneously assumed that there was an exuded bone from his reading of Claimant's medical records. Dr. Peterson testified that Claimant did not have a bone that exuded through the skin. Dr. Peterson testified that bone did not come out, but instead Dr. Drennan removed the blackened area.

Dr. Peterson indicated that Dr. Bartel failed to order x-rays or any cultures or diagnose osteomyelitis when he first saw Claimant on September 22, 1987. Dr. Bartel did not diagnose osteomyelitis until October 27, 1987, almost two months after Claimant was discharged from Jacksonville. Dr. Peterson noted that, in his medical opinion, Claimant could have developed osteomyelitis during that period of time. The pathology reports which followed the amputations confirmed the diagnosis of cellulitis and did not show evidence of osteomyelitis.

In response to whether there is a danger of maceration with Betadine soaks, Dr. Peterson testified that such a danger exists with a pressure ulcer, but that was not the case with Claimant who had a gangrenous toe.

Dr. Peterson testified that a high blood sugar level such as Claimant's on February 14 could be a sign of non-compliance or infection. Dr. Peterson testified that the debridement done was equivalent to the incision and drainage procedure used with a diabetic foot infection. Furthermore, he said that the incision and drainage procedure is used when there is a deep infection to allow for drainage.

From May to July, Claimant's foot had healed and there were no signs of infection. The third and fourth toes appeared to be infected on July 16, 1987. On July 17, Claimant's third and fourth remaining toes appeared reddened. This was the first time Claimant's toes or foot exhibited signs of reddening. Dr. Peterson testified that both cellulitis and osteomyelitis can cause reddening or swelling. There was swelling of the left foot and ankle on July 19th which could have resulted from cellulitis as well as other infections. Claimant was given intravenous antibiotics on July 21, 1987. However, Dr. Peterson's notes indicated that Claimant's foot had no swelling, redness or pain.

Dr.Peterson testified that Claimant suffered from peripheral vascular disease and diabetic neuropathy and he acknowledged that as diabetes progresses, a diabetic may lose sensation both to touch and pain.

Subsequent to the amputation on July 27, 1987, Dr. Peterson examined Claimant on August 4 and found Claimant's foot was clean and healing. There were no signs of infection and his blood sugar level was good. Dr. Peterson continued the use of antibiotics for 10 days. On

August 5, the incision exhibited one small open area with red serous drainage, but no sign of infection. On August 6, there was a small amount of bleeding from the incision, but no redness, swelling or pain and the incision was clean. On August 8, the incision was clean and there was no drainage.

September 3, 1987, was the last time Dr. Peterson saw Claimant. Some discharge was present from the amputation site, the skin around the rest of the incision looked good. Shortly before his discharge, Claimant developed some swelling and drainage. He was put on antibiotics for a possible infection in his foot. Dr. Peterson testified that the medical staff's ability to respond to Claimant's new condition was limited because of his imminent release. Because Claimant's foot was not completely healed, Dr. Peterson stressed the need for him to seek immediate medical attention after his discharge.

Dr. Peterson testified that Claimant's condition from January 12 to September 4, 1987, was a recurrent problem rather than a persistent one and that his infection only became persistent right before his release. From May to July, Claimant experienced no problems with his foot. He was in the general population and walking without experiencing a problem. For individuals who have serious peripheral vascular disease, such as Claimant, who had a toe amputated prior to his arrival at Jacksonville, the question is not if they lose more toes, but when. Dr. Peterson stated that while Claimant never had any specific testing for peripheral vascular disease, the most likely cause of his initial amputation was the peripheral vascular disease which is the deterioration caused by diabetes. Dr. Peterson testified that while a diabetic may not feel pain, there is redness and swelling, and if the condition is left untreated, it will point to the surface and cause drainage.

In Dr. Peterson's opinion, it is unlikely that osteomyelitis could have been present without the symptoms of redness or pain. In explaining his treatment of Claimant's condition, Dr. Peterson testified that the presence of redness and swelling could signal either osteomyelitis or cellulitis. First, the patient is treated for cellulitis. If the condition does not improve, the doctor must then think about osteomyelitis and further tests.

Dr. Drennan's final diagnosis of Claimant was Buerger's Disease and gangrene in the third and fourth toes of the left foot. Buerger's Disease is an indication of vascular problems wherein the toes become gangrenous. Smoking would worsen the condition of a diabetic's toes to the point at which he would lose them.

Finally, Dr. Peterson acknowledged having heard of the two diabetic foot books presented as authority by Dr. Bartel, however he admitted that he had never read them.

Cindy Boston, a registered nurse, testified that she is currently the health care administrator at Taylorville Correctional Center in Taylorville, Illinois. She was the health care administrator at Jacksonville during the time of Claimant's incarceration. She has also worked as the head nurse at Passavant Hospital since 1970. Nurse Boston did not treat Claimant. Her testimony was based on her review of Claimant's medical records, her own summary of his medical records, Dr. Bartel's original statement, deposition and letter to the Claimant's attorney, and the personal property inventory records of Claimant during his stay at Jacksonville. Ms. Boston presented three personal property inventories of Claimant from January 12, April 21 and July 20, 1987. Claimant had nine packs of cigarettes in April and eight in July. The January and April inventories revealed that Claimant had soda pop and the July inventory established that Claimant had cookies in his possession.

Nurse Boston testified that Claimant appeared for medical treatment approximately the same number of times that he failed to appear. Inmates can refuse any form of medical treatment unless it involves a life-threatening condition.

With respect to sugar products, soda pop and cookies in Claimant's inventories, nurse Boston discounted the notion that Claimant was medically treating his diabetic condition. She testified that it is not standard procedure for diabetic inmates to treat their own diabetes. Help was available to an inmate with a low blood sugar level within a few minutes. Inmates are afforded daily access to the health care unit to request medical services.

The visits Claimant missed at the health care facility were for showers, cleaning his feet in the bath, applying dressings, and allowing the nursing staff to monitor his progress.

For an inmate on a special diet, instruction is given, a copy of the diet is brought to dietary, and the inmate goes to a special diet line. Claimant received daily insulin injections at the health care unit.

In response to Dr. Bartel's criticisms, nurse Boston disagreed with Dr. Bartel's assertion that no culture was taken on January 17 when it was reported that pus was present. The medical staff had already taken a culture on January 12 prior to starting Claimant on the medication. Results of the culture established that Claimant was sensitive to the medication and she concluded that it was the proper treatment.

She testified that Dr. Bartel was incorrect in stating that only physicians can perform debridements and that the debridements were not performed under sterile conditions. A debridement procedure can be as simple as

cleaning a wound, a job which nurses can perform. Doctors Drennan and Peterson performed all of the surgical debridements. Registered nurses performed non-surgical debridements under sterile conditions.

In response to Dr. Bartel's assertion that there was an entry citing decreased swelling in Claimant's foot, ankle and calf on April 18, nurse Boston testified that Dr. Bartel was relying on a subjective assessment that Claimant himself gave to Dr. Duval. The note reflects Claimant's own description of what the toe looked like, not whether there was actually any swelling present.

The American Correctional Association ("ACA"), an accrediting body responsible for inspecting correctional facilities and reviewing all aspects of care to insure general standards are met, had approved the conditions at the Jacksonville Correctional Center.

Jacksonville uses a hydrotherapy foot massage pursuant to the physicians' orders. The process was described as a small soaking foot bath with a motor that vibrates the water, not comparable to the much larger whirlpools used in community hospitals. The foot massage at Jacksonville is used with a solution, ordered by the physician, to gently shake the water in order to clean a wound and remove only dead tissue as opposed to doing it by hand which would also remove healing tissue.

The law is clear that to establish medical malpractice, Claimant must first establish the medical standard of care by which the Respondent's conduct is to be measured, that the Respondent deviated from the standard of care, and that the Respondent's conduct proximately caused injury to the Claimant. (*Massone v. Holmes* (1990), 197 Ill. App. 3d 886.) The standard of care is that care which is provided to a patient by reasonably well-

trained medical providers in the same circumstances in a similar locality. The standard must be generally accepted in the medical community, and it is not sufficient for the patient's expert witness to testify that he would have acted differently in the same circumstances, or that alternative methods of proceeding exist. (*Wilsman v. Sloniewicz* (1988), 172 Ill. App. 3d 492.) The Claimant must establish the standard of care. *Thomas v. State* (1987), 40 Ill. Ct. Cl. 188; *Bock v. State* (1991), 43 Ill. Ct. Cl. 299.

The Claimant has attempted to establish the standard of care through the testimony of Dr. Bartel, a board certified podiatrist, who is well-qualified and experienced in the treatment of the diabetic foot.

Dr. Bartel testified that the standard of care for treatment of the diabetic foot is set forth in *The Management of Diabetic Foot Problems*, Jocelyn Foot Clinic of New England (1984). The proper procedures as indicated in that text are culture, bed rest, antibiotic, appropriate drainage, proper dressings and neuropathic x-rays.

However, the law is also clear that it must be established that the Claimant's expert is a licensed member of the school of medicine about which he proposes to express an opinion. While Dr. Bartel appears to be an eminently qualified podiatrist, he is not licensed in the same school of medicine as Dr. Peterson, a licensed medical doctor board certified in family practice. Accordingly, a podiatrist is not competent to render expert opinion as to the standard of care to be followed by a family practitioner in this case. *Dolan v. Galluzzo* (1979), 77 Ill. 2d 279; *Purtill v. Hess* (1986), 111 Ill. 2d 229.

Claimant has therefore not proven that the standard of care for a family practice medical doctor dictated an x-ray of the Claimant's foot to make a proper diagnosis and

a determination of whether Claimant was suffering from cellulitis and/or osteomyelitis. It is Claimant's position that Respondent's failure to x-ray the affected area constituted a deviation from the standard of care. We cannot agree because of the lack of competent medical expert testimony.

Respondent contended that the Claimant was not suffering from osteomyelitis at the time and that an x-ray was not indicated because the doctors did not observe redness of the area and that Claimant did not report pain. Respondent did not establish another standard of care nor did Respondent dispute the standard of care presented by Claimant. No non-treating experts testified for Claimant or Respondent as to the standard of care on this point.

Respondent's failure to x-ray the Claimant's foot establishes a deviation from the standard of care as set forth by Claimant's expert for a podiatrist but not for a medical doctor. If Claimant had called an expert licensed in the same school of medicine who gave similar opinions as Dr. Bartel or if we found a waiver of the expert's qualifications based on Respondent's incredible lack of objections, we could have found a deviation from the standard of care. The symptoms of cellulitis and osteomyelitis are essentially the same except that osteomyelitis has more intense pain and a longer duration of pain. The providers could not rely on Claimant's pain as an indicator since Claimant suffered from peripheral neuropathy which reduced his sensitivity to pain.

In addition, there were other signs which could have been indicators of osteomyelitis. On January 20, 1987, Dr. Peterson's notes indicated the presence of pus in the affected area and that the patient had a fever of 101 degrees. Dr. Peterson admitted that both of these symptoms

could have indicated osteomyelitis. Also in April of 1987 the patient demonstrated swelling in the calf and ankle, which is another possible indicator of osteomyelitis.

The Respondent failed to object to the opinions of Dr. Bartel and in light of Claimant's complete medical history, the Respondent's physicians most likely could not have made a reliable diagnosis without an x-ray of the foot and anaerobic cultures which would have conclusively distinguished between cellulitis and osteomyelitis. However, there is no competent expert testimony on this point that we can consider.

Those practicing the medical arts in the penitentiary are held to the same standard of care as those practicing in the communities in our State. To hold otherwise would be to abandon reason and common sense. We must recognize, however, that constraints necessarily exist in correctional institutions which have or may have a negative impact on the ability to deliver medical services. The medical arts practitioner should not be held liable for injuries resulting from these constraints. Such a restraint would be the imminent release of a patient and the subsequent inability to continue treating the patient. However, those types of constraints, while interfering with proper medical care, do not lessen the standards required of the medical arts practitioner. There is nothing unduly burdensome in holding that physicians employed by the Department of Corrections give inmates whom they treat the same duty of care which they owe their patients in private practice. *Madden v. Kuhn* (1978), 56 Ill. App. 3d 997, 1002.

The second issue is whether the Respondent's failure to x-ray and perform anaerobic cultures on the Claimant's foot and make a conclusive diagnosis was a proximate cause of the Claimant's injury. Even if we were to consider that the Respondent waived any objection to the

opinions of Dr. Bartel, the critical testimony of Dr. Bartel is as follows:

Q. "Do you have an opinion as to a reasonable degree of medical certainty that if these indicated procedures had been followed, cultures, x-rays, incision and draining and so forth during the time period that Mr. Cleckley was in Jacksonville Correctional Center whether his infection would have healed and he could have saved all or some of his toes?"

A. "There is no way to say that for certain because diabetics are a difficult problem, but without adequate care and standard of care the chances of him healing up was much less and I feel that the patient should have— even if he was incarcerated should have standard of care."

The standard of proof for causation is that Claimant must prove by a preponderance of the evidence that Respondent's conduct was a proximate cause of the injury. (*Wise v. St. Mary's Hospital* (1978), 64 Ill. App. 3d 587.) Proximate cause is an essential element that must be proved in every medical malpractice case. Failure of the Claimant to establish that an act of medical negligence proximately caused the injuries suffered by the Claimant defeats the claim. (*Tops v. Logan* (1990), 197 Ill. App. 3d 285.) The Claimant sustains his burden by proving, generally through expert testimony, that Respondent's breach of the applicable standard of care is more probably true than not the cause of Claimant's injury. *Borowski v. Von-Solbrig* (1975), 60 Ill. 2d 418; *Bishop v. Baz* (1991), 215 Ill. App. 3d 976.

Proximate cause is not established where the causal connection is contingent, speculative or merely possible. (*Newell v. Corres* (1984), 125 Ill. App. 3d 1087; *Pumula v. Sipos* (1987), 163 Ill. App. 3d 1093; *Mazur v. Lutheran General Hospital* (1986), 143 Ill. App. 3d 528; *Piano v. Davidson* (1987), 157 Ill. App. 3d 649.) Dr. Bartel was specific in his opinions that Dr. Peterson deviated from the standard of care. However, Dr. Bartel did not specifically testify or state words to the effect that it was more probably true than not true that Respondent's negligence was

the proximate cause of Claimant's injury. (*Kaplan v. Berger* (1989), 184 Ill. App. 3d 224.) Claimant spent a considerable amount of his time questioning Dr. Bartel in regard to establishing the standard of care and the deviations therefrom. The testimony as to proximate cause is virtually non-existent and is too speculative even if we accepted Dr. Bartel's opinions against a medical doctor. As the Claimant must establish that the failure to diagnose to a reasonable degree of medical certainty more probably than not caused the injury, he has failed to sustain his burden of proof. *Pumula v. Sipos* (1987), 163 Ill. App. 3d 1093.

In this case, Claimant has failed to establish that a direct causal relationship exists between the Respondent's alleged deviation from the standard of care and the Claimant's resulting injury.

Dr. Bartel, a podiatrist, testified that in his opinion and assuming Claimant had osteomyelitis while under the care of the Respondent, if Claimant had been diagnosed and the infected bone had been removed, the Claimant would have had a chance to heal and further surgeries would have been prevented.

However, the Claimant's treatment history does not lend credence to his position. Claimant's history indicated a multitude of health problems including diabetes, tuberculosis, eye trouble, high blood pressure and arthritis, in addition to a prior amputation. Claimant had one toe amputated prior to his incarceration in the State facility while incarcerated at a Cook County facility. In the opinion of Respondent's expert, Dr. John Peterson, M.D., the issue was not if further amputation would be necessary, but rather when they would be necessary. In addition, Claimant's failure to comply with some of his medical treatment may have contributed to his own injury.

Evidence was presented to establish that Claimant missed a number of scheduled visits at the health care facility for monitoring of Claimant's progress and he had refused to comply with his current doctor's recommendation and had discontinued treatment. There were also periods of time while incarcerated that Claimant did not have foot problems and the toes were healing.

Finally, and most importantly, the pathology reports on the bone removed by amputation from Claimant during his incarceration did not indicate the presence of osteomyelitis. This would indicate that no osteomyelitis existed during this time, which would support Dr. Peterson's contention that osteomyelitis developed after Claimant was discharged.

Following each of the amputations performed during Claimant's incarceration, pathology studies were performed on the bone and the pathology reports did not indicate the presence of osteomyelitis. Respondent's expert, Dr. John Peterson, testified Claimant may have developed osteomyelitis in the period following his release from the State prison on September 4, 1987, and Dr. Bartel's diagnosis of osteomyelitis on October 27, 1987.

We find that Claimant has failed to prove by a preponderance of the evidence that any alleged deviation was a proximate cause of Claimant's injury. The evidence is more probable than not that Claimant did not have osteomyelitis until very late in his incarceration or after release and prior to the x-rays taken by Dr. Bartel. The fact that the pathology reports did not indicate osteomyelitis, the fact that Claimant had periods of no infection or medical problems to his feet, and the fact Dr. Bartel did not initially order x-rays are all significant in our decision.

We also find that the cigarettes, soda pop and cookies listed in the inventory sheets do not constitute comparative

negligence. The burden of proving Claimant's comparative negligence was upon the Respondent. (*Casey v. Baseden* (1986), 111 Ill. 2d 341.) However, not every negligent act of a claimant will be considered under the doctrine of comparative negligence. We find the evidence presented too speculative to sustain a finding of comparative negligence regarding the cigarettes, soda pop and cookies.

For the foregoing reasons, it is ordered, adjudged and decreed that the Claimant's claim is denied.

## ORDER

FREDERICK, J.

This cause comes on Claimant's petition for rehearing, or in the alternative, a new trial, and the Court having reviewed the entire docket and all pleadings, transcripts, and the Court's opinion, and the Court being fully advised in the premises, wherefore, the Court finds:

(1) That the Court correctly apprehended the facts and the law in this case.

(2) That even if the podiatrist's testimony was competent, the Claimant failed to prove by a preponderance of the evidence that Respondent's actions were the proximate cause of Claimant's injury.

(3) That the Court found the testimony which established a lack of proximate cause more credible.

Therefore, it is ordered that Claimant's petition for rehearing or in the alternative, a new trial, is denied.